UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE | : | BANKRUPTCY NO. 09-10169 |
| | : | (Consolidated for Administration) |
| | : | CHAPTER 11 |
| EXCALIBUR MACHINE CO., INC., | : | |
| CAMELOT CONSOLIDATED, INC., | : | |
| BLADE TRANSPORT, INC., MULTI- | : | |
| PLASTICS, INC., MULTI-TOOL, INC., | : | |
| MULTI-PLASTICS OF NEW MEXICO, | : | |
| INC., SIPCO, INC., and E.A.H. | : | |
| INDUSTRIES, INC., Debtors | : | |
| | : | |
| SAMUEL SON & CO., INC., | : | DOCUMENT NO. 39 |
| Movant | : | |
| | : | |
| vs. | : | |
| EXCALIBUR MACHINE CO., | : | |
| INC., Respondent | : | |

APPEARANCES:

GUY C. FUSTINE, ESQ. AND JOSEPH F. GULA, III, ESQ., ERIE, PA, ATTORNEYS FOR
 DEBTORS
MICHAEL J. LOMBARDI, ESQ., BUFFALO, NY AND THOMAS J. MINARCIK, ESQ.,
 ERIE, PA, ATTORNEYS FOR SAMUEL SON & CO., INC.
MARK E. FREEDLANDER, ESQ., PITTSBURGH, PA, ATTORNEY FOR OFFICIAL
 COMMITTEE OF UNSECURED CREDITORS
DANIEL J. BURSEC, ESQ., PITTSBURGH, PA, ATTORNEY FOR S&T BANK
NORMAN E GILKEY, ESQ., PITTSBURGH, PA, ATTORNEY FOR NATIONAL CITY BANK
SUSAN F. REITER, ESQ., ERIE, PA, ATTORNEY FOR MERCER COUNTY STATE BANK,
JAMES R. WALCZAK, ESQ., ERIE, PA, ATTORNEY FOR F.N.B. CAPITAL CORP., LLC

WARREN W. BENTZ, U.S. BANKRUPTCY JUDGE

MAY 13, 2009

## OPINION

### I.    Introduction

On January 31, 2009 (the "Petition Date") Excalibur Machine Co., Inc., Camelot

Consolidated, Inc., Blade Transport, Inc., Multi-Plastics, Inc., Multi-Tool, Inc., Multi-Plastics Of

New Mexico, Inc., Sipco, Inc., and E.A.H. Industries, Inc. each filed voluntary petitions under

Chapter 11 of the Bankruptcy Code. By Order dated February 6, 2009, the cases were consolidated for joint administration under the Excalibur Machine Co., Inc. Case at Bankruptcy No. 09-10169 ("Debtor" or "Excalibur").

On February 11, 2009, Samuel Son & Co., Inc. ("Samuel") filed its MOTION TO PROHIBIT USE OF CASH COLLATERAL OR PROVIDE ADEQUATE PROTECTION AND TO REQUIRE DEBTOR TO EITHER ASSUME OR REJECT CONSIGNMENT SECURITY AGREEMENT AND OTHER RELIEF (the "Motion") at Document No. 39. The Debtor, the Official Committee of Unsecured Creditors ("Committee") and National City Bank ("NCB") each filed a response in opposition to the Motion. A hearing was held on March 10, 2009 and the parties filed briefs on March 13, 2009. We find that documentation clearly reflects the intent of the parties and that the issues are ripe for decision.

## II.    Factual Background

On December 3, 2004, Samuel as Consignor and Excalibur as Consignee executed a document entitled Consignment Security Agreement (the "Agreement"). The Agreement provides Samuel a "continuing security interest . . . in the Consigned Goods." The Consigned Goods are specifically identified in Appendix A to the Agreement. On February 14, 2006, the Agreement was amended "to include the goods described on Attachment A hereto in the definition of Consigned Goods." Attachment A to the amendment which is entitled APPENDIX A TO CONSIGNMENT SECURITY AGREEMENT provides that: [T']he Consigned Goods subject to the above Consignment Security Agreement are as follows:

> <u>A 36</u>
> 46 plates ¾ x 134 x 134
> 70 plates 1 x 78 x 205
> 32 plates 1 x 96 x 240 Blast & Seal

2

<u>572 Grade 30</u>
17 plates ½ x 96 x 240
13 plates 5/8 x 96 x 240
21 plates ¾ x 96 x 240
18 plates 1 x 96 x 240

The Agreement further provides:

>The Consigned Goods are to be maintained as consigned secured goods on the premises of the Consignee at <u>6103 U.S. Hwy 6, Linesville, PA, 16424</u> following receipt of each shipment by the Consignee.  Material may not be removed to another location without the Consignor's prior written consent.  Consignee shall return all Consigned Goods to Consignor upon demand.  The Consigned Goods shall be maintained in a segregated area and shall not be commingled with the property of the Consignee.  The Consigned Goods shall at all times be identified by the Consignee as the Consignor's property and all costs, expenses and disbursements incurred for handling, maintenance and protecting of the Consigned Goods in the Consignee's warehouse shall be the cost of the Consignee.
>
>At such time as any of the Consigned Goods shall have been in the possession of the Consignee for 90 days, the Consignor will inform the Consignee of the aging of the product and the Consignor may invoice the Consignee for such product.
>
>2.  <u>TERMS</u>
>This Agreement shall become effective as of the 3rd day of December, 2004.  The Consignor will invoice the Consignee in accordance with the credit terms established by the Consignor for purposes of this Agreement.  The Consignee agrees to pay all invoices issued under this Agreement within thirty (30) days following the date of the invoice from the Consignor.
>
>3.  <u>TITLE</u>
>Title to the Consigned Goods shall remain in the Consignor at all times.  No right or power is given the Consignee to pledge, hypothecate or otherwise dispose of the Consigned Goods, other than sales to unrelated parties in the normal course of business as hereinafter, provided.  The Consignee shall cause the Consigned Goods to be clearly identified as the property of the Consignor, and the Consignee will not permit any lien to attach to the Consigned Goods.
>
>The Consignee shall have the right to sell the Consigned Goods for cash at a price not less than the minimum purchase price specified by the Consignor.  A security interest in the proceeds of

3

>any such sale or other disposition of the Consigned Goods shall vest automatically in the Consignor.
>
>The Consignee also agrees to keep the Consigned Goods, and the proceeds from the sales thereof, separate and capable of identification, as the property of the Consignor, to make entries in its books showing that the Consigned Goods are held for the account of the Consignor, to report to the Consignor the consummation of any sale promptly after it is made, and furnish the Consignor on written or verbal demand a true and complete report of the Consignee's sales for any period of time stated by the Consignor.
>. . .

The Agreement also provides that "[t]he Consignor shall have all the rights of a Consignor under the Uniform Commercial Code in the Consigned Goods" and that the Agreement shall be interpreted under New York law.

On March 30, 2005, Samuel filed a UCC FINANCING STATEMENT with the State of Pennsylvania covering the following collateral: "Goods sold on consignment by Consignor to Consignee, including but not limited to stainless steel plate and bar as described in Schedule A annexed hereto, and the proceeds therefrom." When the Agreement was amended in 2007, Samuel filed a UCC FINANCING STATEMENT AMENDMENT with the State of Pennsylvania on February 21, 2007. The Amended Financing Statement states that it covers "Goods sold on consignment by Consignor to Consignee, including but not limited to stainless steel plate as described in Appendix A annexed hereto and the proceeds therefrom." APPENDIX A TO CONSIGNMENT SECURITY AGREEMENT is attached to the Amended Financing Statement.

Pursuant to the Agreement, Samuel delivered steel plate to Excalibur's premises where it was kept segregated in an outdoor storage area. Excalibur did not pay for and had no obligation to pay for the steel plate while stored in the segregated area. When Excalibur required steel plate for use in its manufacturing process, it moved the required steel plate from the segregated area

4

into the building for processing. Samuel was notified that Excalibur moved certain goods and Samuel invoiced Excalibur for these goods. Samuel regularly inspected the goods in the segregated area and replenished the steel that had been utilized by Excalibur and invoiced by Samuel.

Once Excalibur moved the steel plate inside the building, it was processed into a finished product and the finished product was sold to Excalibur's customers.

The Consigned Goods that are the primary focus of the Cash Collateral issue in Samuel's Motion arises out of Consigned Goods that were removed from the outside storage area and invoiced by Samuel prior to the Petition Date and for which the invoices remain unpaid.

### III.    Positions of the Parties

Samuel posits that its security interest in the Consigned Goods continues in the goods through Excalibur's work process and into the final product; that as of the Petition Date, Samuel had an interest in proceeds from the collection of Excalibur's accounts receivable; and that Excalibur should be prohibited from using the proceeds from the sale of the Consigned Goods without providing adequate protection payments to Samuel on its secured claim.

Samuel also asserts that Excalibur should immediately assume or reject the Agreement and that Samuel be granted an administrative claim for the sale of any of the Consigned Goods after the Petition Date.

The Debtor posits that the Agreement does not represent a consignment under Pennsylvania law since there was never a sale to a third party; that to the extent Samuel has a consignment interest, the consignment interest only extends to steel which is segregated in the yard; that once Excalibur utilized the steel and Samuel invoiced Excalibur, Samuel's ownership interest in the steel terminated; and that Samuel has no interest in proceeds of Excalibur's accounts receivable because Excalibur never sold the steel to a third party.

5

Excalibur further posits that it has until Plan confirmation to assume or reject the Agreement.

National City Bank ("NCB") supports Excalibur's position.  NCB asserts that the Agreement is not a consignment arrangement; that the rights which Samuel asserts does not comport with the intention of the parties; and that Samuel is not entitled to adequate protection because it has no security interest in any product manufactured by Excalibur or in any account generated through a sale of such manufactured product.

The Official Committee of Unsecured Creditors (the "Committee") asserts that the Agreement and the corresponding appendices delineate specific quantities and types of steel plate as of the dates certain and it is those specified plates alone that constitute Consigned Goods under the Agreement and that none of those specific pieces of steel nor their product or proceeds existed as of the Petition Date and therefore there is no cash collateral in which Samuel has an interest.

## IV.    Scope of Consignment

The parties set up the transaction between them as a consignment.  A form agreement was utilized which is meant for the typical consignment arrangement where the consignee acts as an agent of the consignor for the purpose of delivery to third-party users or customers and where the consignee collects the proceeds for transmission to the consignor. See United States v. Nektalov, 440 F.Supp. 2d 287, 298 (S.D. NY 2006).  In a typical consignment arrangement, there is no absolute obligation on the part of the consignee to pay for the goods because the consignee is not the buyer. Id.  Title does not pass to the consignee. Id.

The intent here was not that the steel be resold to third parties.  The purpose of the Agreement was for Samuel to maintain an inventory of steel plate in a segregated storage area on Excalibur's premises to be available for purchase by Excalibur on an as needed basis.  When

6

Excalibur required certain of Samuel's goods, it purchased the goods by moving them into its facility and notifying Samuel, who then invoiced Excalibur for the purchased goods.

Other terms of the Agreement are inconsistent with the course of dealing by the parties. Excalibur was obligated to turn over the proceeds of the sale of steel made to third parties. There were no third parties.

Excalibur was to keep the Samuel steel separate and apart from other goods. Once Excalibur purchased the steel and incorporated it into its product, it was not segregated. Excalibur treated the purchased steel as its own. There was no accounting for the processed steel or its proceeds.

Under New York law, a "sale" consists of passing title from a seller to the buyer for a price. N.Y. U.C.C. § 2401 (McKinney, 1964). Unless the parties agree otherwise, title passes to the buyer when the seller completes its performance with respect to physical delivery of the goods. Id.

The relationship between the parties changed when Excalibur took the raw steel into its facility. Samuel was notified and issued an invoice with an agreed purchase price to Excalibur for the steel that was purchased. Once invoiced, Excalibur's obligation was to repay a debt; not to return the material or the proceeds from the sale of that material. Excalibur had an absolute obligation to pay for the material in accordance with the terms of Samuel's invoice.

The relationship of debtor and creditor existed, rather than that of consignor and consignee. Once there was an agreement to pay a specific amount, a sale occurred. Title was transferred. United States v. Nektalov, 440 F.Supp. 2d 287, 298 (E.D. NY 2006). The purchased material, being the property of Excalibur, was then subject to the claims of Excalibur's creditors.

V.	Security Interest

The Agreement provides that Samuel has a security interest in the Consigned Goods which are described as "the goods and merchandise which may become subject to the security interest provided for here are described in Appendix A."  Appendix A, entitled Consigned Goods, lists specific sizes and types of raw steel.  The Consigned Goods subject to the security interest were those goods maintained in a segregated area and not commingled with Consignee's property.  The Agreement provides that Consignee had no power to dispose of the Consigned Goods "other than sales to unrelated third parties and that Consignor has a security interest in the proceeds of any such sale, or other disposition of the Consigned Goods."

The Agreement and its Appendix limit the security interest to the listed specific raw steel items.  The UCC Financing Statement filed with the Commonwealth attempts to expand the scope with language that provides for a security interest in "[g]oods sold on Consignment by Consignor to Consignee, including but not limited to stainless steel plate and bar as described in Schedule A annexed hereto, and the proceeds therefrom."

The scope of the Agreement is determined by the language of the Agreement.  The language of security agreements is to be determined as written.  In re Prichard, 170 BR 41, 44 (Bankr. N.D. NY 1994).  A financing statement cannot expand the security provided for in the security agreement.  In re Door Supply Center, Inc., 3 BR 103, 106 (Bankr. D. ID 1980); Mitchell v. Shepherd Mall State Bank, 324 F.Supp. 1029 (W.D. OK 1971).

The issue is whether the language in the Agreement reflects an intent to create a security interest in the Consigned Goods that Excalibur has purchased and incorporated into its finished product and whether the security interest follows into accounts receivable from the sale of finished product to Excalibur's customers.

A description of the collateral in a security agreement is sufficient if it puts subsequent creditors on notice so that aided by inquiry, they may reasonably identify the collateral.

A reading of the enumerated items of the Agreement and the specific listing of materials in the Appendix to the Agreement would lead any interested person or entity to the logical conclusion that Samuel did not intend to obtain and that Debtor did not intend to grant, a security interest in any assets other than the raw material that remained in segregated storage on Debtor's premises and the proceeds of any sale of those raw materials to third parties.

## VI.    Conclusion

For the reasons stated herein, as of the Petition Date, Samuel owned any of the raw material which remained in the segregated storage area on the outside of Debtor's building. To the extent Debtor has purchased and used Samuel's material after the Petition Date that it has not paid for, Samuel is entitled to an administrative claim. Samuel is entitled to a general unsecured non-priority claim for amounts invoiced for material prepetition which remain unpaid.

An appropriate Order will be entered.

/s/ Warren W. Bentz
Warren W. Bentz
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE | : BANKRUPTCY NO. 09-10169 |
| | : (Consolidated for Administration) |
| | : CHAPTER 11 |
| EXCALIBUR MACHINE CO., INC., | : |
| CAMELOT CONSOLIDATED, INC., | : |
| BLADE TRANSPORT, INC., MULTI- | : |
| PLASTICS, INC., MULTI-TOOL, INC., | : |
| MULTI-PLASTICS OF NEW MEXICO, | : |
| INC., SIPCO, INC., and E.A.H. | : |
| INDUSTRIES, INC., Debtors | : |
| | : |
| SAMUEL SON & CO., INC., | : DOCUMENT NO. 39 |
| Movant | : |
| | : |
| vs. | : |
| EXCALIBUR MACHINE CO., | : |
| INC., Respondent | : |

## **ORDER**

This 13th day of May, 2009, in accordance with the accompanying Opinion, it shall be and hereby is ORDERED that the MOTION TO PROHIBIT USE OF CASH COLLATERAL OR PROVIDE ADEQUATE PROTECTION AND TO REQUIRE DEBTOR TO EITHER ASSUME OR REJECT CONSIGNMENT SECURITY AGREEMENT AND OTHER RELIEF filed by Samuel Son & Co., Inc. is DENIED, except that Samuel Son & Co., Inc. shall have an administrative claim and is entitled to payment of amounts due with respect to any part of the raw steel removed from the segregated storage area and utilized by Debtors post-petition.

/s/ Warren W. Bentz
Warren W. Bentz
United States Bankruptcy Judge